## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NASHVILLE SUPERGROUP, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: _____ |
| ) | |
| GARY W. BRIDGES and FEARLESS ) | |
| STUDIOS, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## <u>COMPLAINT</u>

Plaintiff Nashville Supergroup, LLC ("Nashville Supergroup"), by and through its undersigned attorneys, alleges the following against Defendants Gary W. Bridges ("Bridges") and Fearless Studios, Inc. ("Fearless"), upon personal knowledge with respect to itself and its actions and otherwise upon information and belief.

## INTRODUCTION

1.        This is a story of misbehavior, incompetence, sabotage, and defamation in business dealings from beginning to end. This suit arises from a partnership between Plaintiff Nashville Supergroup and Defendant Fearless, of which Defendant Bridges is co-owner and co-CEO, to develop, produce, distribute, and market a new music-competition television show in Nashville (the "Show"). The Show is in production right now with a full cast and crew—indeed, five episodes have already been filmed, and in the coming months, the Show is scheduled for wide release on cable television. The Show's concept and financing are rock solid, and its talent— including its contestants, up-and-coming stars in the music industry—were ready for their big break.

2. However, incompetent, disruptive, and defamatory actions of Defendants since before the Show even started production have harmed the Show and now threaten its very existence. It has come to light that Defendants have failed to perform their responsibilities under the parties' agreement—and, worse, have taken actions to actively sabotage production. Defendants' actions have caused Nashville Supergroup significant and ongoing economic harm from which Nashville Supergroup now seeks relief. Nashville Supergroup brings suit to seek compensation for the harms Defendants' actions have caused, and to ensure Defendants are not allowed to continue to jeopardize the Show's success in the future.

3. Until recently, the Show was being developed and produced by Plaintiff Nashville Supergroup in partnership with Defendant Fearless, a media company co-owned by Defendant Bridges that holds the rights to key pieces of the Show's intellectual property. Nashville Supergroup is a special-purpose entity formed by Florida-based investor Joseph Norelli ("Norelli"). Through Nashville Supergroup, Norelli is the Show's primary investor and funder. Nashville Supergroup has invested several million dollars into the Show's development and production already and expects to invest millions more.

4. Bridges is a veteran music industry director and producer who originally developed the Show's concept. The role of Fearless—the media company Bridges co-owns and for which he serves as director, co-CEO, and President of Production—was to oversee the Show's production and marketing operations. To that end, Nashville Supergroup and Fearless entered into a joint venture agreement (the "JV Agreement"), attached hereto as Exhibit A, in which they agreed that Nashville Supergroup would invest several million dollars into the Show and that Fearless would license the Show's intellectual property to Nashville Supergroup for use in the Show's development and production. Ex. A at 1, 3, 7. In that same agreement, Nashville Supergroup and

Fearless also agreed to a joint division of responsibilities for the Show's production, in which Nashville Supergroup would handle "[a]ll financial decisions and responsibilities" while Fearless handled "[a]ll operations and marketing operations." Ex. A at 5.

5. Since the start of production—which began in August—it has been abundantly clear that Fearless lacks either the ability or the intent (or both) to perform its production and marketing responsibilities under the JV Agreement. For example, one of Fearless's express duties under the JV Agreement is to "[g]enerat[e] sponsorship" for the Show. Ex. A at 5. Since the beginning of his conversations and negotiations with Nashville Supergroup, Fearless's director, co-CEO, and President of Production Bridges has assured the involvement of major sponsors for the Show, including the internationally famous Hard Rock Café brand and major celebrities including a billionaire social media influencer and a Hall of Fame pitcher. But Fearless has entirely failed to produce these promised sponsorships. And Fearless has woefully failed in other aspects of its production duties as well, including its obligation to produce the Show's script—without which, of course, there would be no Show to film.

6. Worse, while Fearless has failed to live up to its production obligations, Bridges has been seeking to actively and intentionally sabotage and undermine the Show's production in a concerted effort to halt production. Shockingly, in recent days, Bridges has made a variety of misrepresentations to the Show's contestants in an effort to convince them to walk away from the cast. Among other things, Bridges has baselessly informed the Show's contestants that Nashville Supergroup "stole" the Show from him—a patently false assertion given the fact that Bridges's own company Fearless licensed the Show's intellectual property to Nashville Supergroup for **Nashville Supergroup's** use in developing, producing, distributing, and marketing the Show. Moreover, on information and belief, Bridges has asserted these same falsehoods to the television

3

network ("Network") that plans to distribute the Show, in a transparent attempt to convince the Network to drop the Show altogether.

7.     Bridges's tortious behavior has succeeded in delaying the Show's production, causing harm to the Show and Nashville Supergroup already.  To date, as a result of Bridges's disruptive and defamatory assertions, 13 of the Show's original 25 contestants for its current round of episodes have left the production.  As a result of Bridges's conduct, Nashville Supergroup has, at significant additional cost, been working on finding replacement contestants so that the Show's production can proceed notwithstanding Bridges's malicious attempts at sabotage.

8.     As a result of both Fearless's failure to perform its production duties and Bridges's naked and ongoing attempts to undermine production, Nashville Supergroup has suffered significant economic harm and is likely to incur more in the future, including the cost of hiring a replacement writer and graphic designer for the Show, finding and negotiating contracts with replacement contestants, and reshooting parts of several episodes that have already been filmed to remove footage of departed contestants and replace it with new footage of replacement contestants. Nashville Supergroup has invested millions of dollars into the Show already.  If allowed to proceed unhindered by further disruptions by Defendants, the Show's ultimate earning potential is in the hundreds of millions of dollars.  Nashville Supergroup brings this action to protect its investment and halt Defendants' continuing course of unlawful and tortious behavior.

## PARTIES

9.     Nashville Supergroup, LLC is a limited liability company organized in Tennessee. Nashville Supergroup has one member, Florida Supergroup, LLC ("Florida Supergroup").  Florida Supergroup is a limited liability company organized in Florida.  Florida Supergroup has one

member, Joseph Norelli, who is a natural person domiciled in Florida. Nashville Supergroup is therefore a citizen of Florida.

10. Gary W. Bridges is a natural person domiciled at 1556 Stokley Lane, Old Hickory, Tennessee, and is therefore a citizen of Tennessee.

11. Fearless Studios, Inc. is a Delaware corporation with its principal place of business at 1556 Stokley Lane, Old Hickory, Tennessee. Fearless is therefore a citizen of Delaware and Tennessee.

## JURISDICTION

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

13. This Court has personal jurisdiction over Defendants Bridges and Fearless because Defendants reside in and transact business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## VENUE

14. Venue is proper in the Middle District of Tennessee under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Nashville Supergroup's claims occurred within the District, Defendant Bridges resides in this District, the principal place of business of Defendant Fearless is within this District, and Defendants transact business in the District.

## FACTUAL ALLEGATIONS

### I. The Show's Background and Origins

15. Nashville Supergroup is a special-purpose venture formed for the purpose of investing in and producing the Show, a music-competition television show in Nashville, Tennessee. Hosted and judged by music industry luminaries, the Show will feature several dozen

of the industry's up-and-coming stars as they compete for the opportunity to land a record deal. The Show is currently in production. Five episodes have been filmed and are in post-production, with several other episodes to be filmed in the near future. The Show is scheduled to air on a global media company's cable television channel in early fall.

16.     For several years dating back to at least 2012, Defendant Bridges, a veteran music industry director and producer known by the names Gary Bridges, Gary Wayne Bridges, and GWB, sought unsuccessfully to develop and produce the Show.[1]  Through a Tennessee special-purpose corporation, Supergroup, Inc., Bridges owns the trademark rights to the Show's name as well as the Show's website, according to a joint venture agreement Bridges and Supergroup, Inc. later entered into with Fearless, hereto attached as Exhibit B.  *See* Ex. B at 1.

17.     Nashville Supergroup first came into contact with Defendants Bridges and Fearless in early 2022, when Bridges was introduced to Joseph Norelli, a Florida-based investor and Nashville Supergroup's controlling principal, to discuss the possibility of working together to produce the Show.  In the discussions that followed, Norelli came to understand that Bridges had been seeking investment money to produce the Show for several years and was currently seeking to develop the Show through Fearless, a company that he had recently co-founded for the purpose of producing, distributing, marketing, and managing the Show.

18.     Fearless, a Delaware corporation operating out of Tennessee, was formed in October of 2020.  Fearless is owned and operated by two individuals: Bridges and Nico Albano ("Albano"), a New York-based investor and businessman.  According to Fearless's Stockholders' Agreement, attached hereto as Exhibit C, Bridges and Albano are Fearless's sole stockholders—

---

[1] *See* Deadline, *Music Reality Series Aims to Create Supergroup, Barry Josephson Producing* (Feb. 7, 2012), https://deadline.com/2012/02/music-reality-series-aims-to-create-supergroup-barry-josephson-producing-227014/.

each holding a 50% stake in the company—and serve as its directors and co-CEOs.  Ex. C at 1–2.  Bridges also serves as Fearless's President of Production, while Albano serves as its President of Operations.  Ex. C at 2.

19.     At the time Fearless was formed in October of 2020, it entered into a joint venture agreement with Bridges and his special-purpose corporation Supergroup, Inc. in which Supergroup, Inc. "agree[d] to contribute the Intellectual Property, including without limitation the Trademark" for the Show "for use on an exclusive basis" by Fearless in its development and production of the Show.  Ex. B at 1.

## II.     Nashville Supergroup Agrees to Invest Millions of Dollars to Develop and Produce the Show Based on Representations from Bridges

20.     Beginning in February of 2022, Norelli held a series of meetings and conversations with Bridges and others in which Bridges pitched his idea for the Show, and the parties engaged in negotiations regarding Nashville Supergroup's investment and involvement in the Show's development and production.

21.     During those conversations and in multiple pitch decks provided by Bridges to Norelli, Bridges represented to Norelli that the internationally famous Hard Rock Café brand owned by Hard Rock Café International (USA), Inc. ("Hard Rock") would be sponsoring the Show and providing the use of its hotel properties for on-location shooting of the Show's episodes.

22.     For example, in a February 2022 text message, Bridges told Norelli that the Show would be "using Hard Rock locations all across the US."  And in correspondence from March of 2022, Bridges represented to Norelli that "Hard Rock is prepared to go directly to contract upon funding" and had "already approved all promotional material."

23.     Ultimately, however, despite Bridges's promises, Hard Rock was never involved in the Show's sponsorship and production.

7

24.     During these initial meetings and conversations, Bridges also represented to Norelli that numerous major celebrities would be involved in sponsoring and promoting the Show, such as a Hall of Fame New York Yankees pitcher.  For example, in a text message, Bridges informed Norelli that the Hall of Fame pitcher would "do anything he can to help us with the show."

25.     Ultimately, however, Bridges did not procure the sponsorship or promotion of major celebrities such as the Hall of Fame pitcher.

26.     In reliance on Defendant Bridges's representations and promises regarding the Show, Norelli agreed to invest millions of dollars into Fearless's development and production of the Show through his special-purpose entity Nashville Supergroup, in exchange for which Nashville Supergroup would recoup 100% of its investment and receive a percentage of profits from the Show's production, distribution, and marketing.  Bridges, Norelli, and Fearless further agreed to a division of labor in which Nashville Supergroup would oversee and control all financial decisions relating to the Show, while Fearless would handle the Show's production and marketing operations.

## III.    Nashville Supergroup and Fearless Enter into a JV Agreement Governing the Show's Production and the Parties' Respective Responsibilities

27.     On September 11, 2022, Nashville Supergroup and Fearless entered into the JV Agreement, in which they memorialized the terms of their agreement regarding Nashville Supergroup's investment in the Show and the parties' respective responsibilities in developing and producing the Show.

28.     The JV Agreement was signed on Nashville Supergroup's behalf by its controlling principal Norelli and on Fearless's behalf by its director and co-CEO Albano.  Ex. A at 23.

29.     In the JV Agreement, the parties acknowledged that Nashville Supergroup "is engaged in the business of producing, distributing, marketing and managing" the Show—defined

as the "JV Business"—and that the parties would operate a joint venture through Nashville Supergroup "for the purpose of engaging in the JV Business."  Ex. A at 1.

30.     In the JV Agreement, the parties agreed that Nashville Supergroup would make a "contribution of $10,000 U.S. Dollars and a loan of $3,000,000.00 U.S. Dollars, payable as needed by the JV Business."  Ex. A at 3, 7.  And the parties agreed that Fearless would, in exchange, license the Show's intellectual property, to which it holds the rights, to Nashville Supergroup for its use in developing and producing the Show.  Ex. A at 1, 7.

31.     Accordingly, as an addendum to the JV Agreement, the parties included and executed a licensing agreement (the "Licensing Agreement") in which Fearless granted to Nashville Supergroup "during the Term (as defined below) an exclusive, royalty-free, non-transferable (except as provided in Section 11), non-sublicensable (except as provided in Section 1.2) license to use the Licensed Intellectual Property in connection with the conduct of the Business."  Ex. A at 25.

32.     In defining its "Term," the Licensing Agreement made clear that Nashville Supergroup's license to use the Show's intellectual property to which Fearless holds the rights "will remain in force until the expiration or termination of the JV Agreement."  Ex. A at 30.

33.     In the JV Agreement, the parties agreed to a division of responsibilities between Nashville Supergroup and Fearless under which "[a]ll financial decisions and responsibilities related to the JV Business will be the responsibility of JV Party A [*i.e.*, Nashville Supergroup], including the following:

> (i)     Finalization of all budgets related to the JV Business;
>
> (ii)    Handling of all revenues and expenses;
>
> (iii)   Distribution of all funds to 1099 contractors;

> (iv)    Maintaining and sharing all financial data relevant to the JV Business;
>
> (v)    Securing additional capital funding, as needed; and
>
> (vi)    Negotiating all contracts and agreements with respect to the foregoing."

Ex. A at 5.

34.    In that same division of responsibilities, the parties agreed that "[a]ll operations and marketing operations and execution thereof shall be the responsibility of JV Party B [*i.e.*, Fearless], including the following:

> (i)    All aspects of production for top quality entertainment TV/streaming show (collectively, the 'Show');
>
> (ii)    Gathering all applicants and necessary talent to perform the Show;
>
> (iii)    Generating sponsorship, product placement revenue and vendor partners to support the Show;
>
> (iv)    Performing all aspects of producing the Show within budget and in a commercially reasonable timeframe;
>
> (v)    Maintaining a commercially reasonable regiment of forwarding revenue and expense paperwork to LLC [*i.e.*, Nashville Supergroup]; and
>
> (vi)    Securing all possible additional capital."

Ex. A at 5.

35.    In the JV Agreement, the parties agreed to a distribution of the Show's net profits and losses in which Nashville Supergroup would first recoup 100% of its investment, with profits beyond that point to be shared by certain percentages between Nashville Supergroup and Fearless. Ex. A at 6. In particular, the JV Agreement provides that "the Net Profits and Net Losses for each fiscal year during the term of this Agreement shall be determined in accordance with the

accounting methods followed by LLC [*i.e.*, Nashville Supergroup] for federal income tax purposes and shall be allocated among the Parties as follows:

> (i) First, to JV Party A [*i.e.*, Nashville Supergroup], in the amount of any and all capital loans and expenditures made on behalf or for the benefit of the JV Business; then,
>
> (ii) during the first year under this Agreement, Net Profits shall be allocated as follows: 20% to JV Party A and 80% to JV Party B [*i.e.*, Fearless],
>
> (iii) during the second year under this Agreement, Net Profits shall be allocated as follows: 15% to JV Party A and 85% to JV Party B, and
>
> (iv) during the third year under this Agreement, Net Profits shall be allocated as follows: 10% to JV Party A and 90% to JV Party B."

Ex. A at 6.

36. In a provision defining the "Governing Law" of the JV Agreement, the parties agreed that "[t]his Agreement (and any claims, causes of action, or disputes that may be based upon, arise out of, or relate to the transactions contemplated hereby, to the negotiation, execution, or performance hereof, or to the inducement of any Party to enter herein, whether for breach of contract, tortious conduct, or otherwise and whether predicated on common law, statute, or otherwise) shall in all respects be governed by and construed in accordance with the internal laws of the State of Tennessee without giving effect to any choice or conflict of law provision or rule (whether of the State of Tennessee or any other jurisdiction)." Ex. A at 21.

37. In a forum selection clause, the parties agreed in the JV Agreement that "[a]ny legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby shall be instituted in the federal courts of the United States of America or the

courts of the State of Tennessee, in each case located in the city of Nashville and Davidson County, or the federal courts of the United States of America or the courts of the State of Tennessee, in each case located in Davidson County, Tennessee and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding." Ex. A at 21.

38. Lastly, in an attorneys' fees provision, the parties agreed in the JV Agreement that, "[i]n the event that a Party institutes any legal suit, action, or proceeding, including arbitration, against the other Party in respect of a matter arising out of or relating to this Agreement, the prevailing Party in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such Party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs." Ex. A at 21.

## IV. The Show Begins Production, During Which Fearless Fails to Adequately Perform Its Contractual Duties

39. Shooting for the Show's first five episodes—which focus on the initial auditions of a large group of approximately 50 contestants, each of whom signed a likeness release—was completed in late August. Many of these initial contestants were located and sourced by Defendant Bridges. The next set of episodes—which will focus in greater detail on a smaller group of 25 contestants who made it past the initial audition stage—is set to begin filming in the near future.

40. However, Nashville Supergroup is struggling to continue production as a result of the actions of both Defendants Bridges and Fearless.

41. For example, the JV Agreement obligates Fearless to handle "[a]ll aspects of production" for the Show. Ex. A at 5. As has been contemplated both by the explicit terms of the JV Agreement and in the parties' many meetings and conversations regarding the Show's development and production, an essential aspect of production is ensuring that the Show has a high-quality script for its episodes.

42.     Fearless has failed to provide an adequate script for the Show's episodes, to the point that Nashville Supergroup was forced to retain a replacement writer at extra expense to complete writing duties that were Fearless's responsibility to perform.

43.     The JV Agreement also obligates Fearless to "[g]enerat[e] sponsorship, product placement revenue and vendor partners to support the Show." Ex. A at 5.

44.     Fearless has failed in its duties to generate promised sponsorships for the Show as described in its director, co-CEO, and President of Production Bridges's original proposals.

45.     For example, despite the repeated representations and promises of its director and co-CEO Bridges, Fearless never obtained the sponsorship of the Show's planned primary sponsor Hard Rock Café.

46.     Indeed, Fearless's complete failure to secure Hard Rock's sponsorship only became apparent in late August, after the Show's production team had made plans to transport the Show's host and key crew members to a Hard Rock venue in Florida for a promotional shoot. Just days before the promotional shoot was to take place, Nashville Supergroup learned that Hard Rock's corporate department had not been advised of the proposed use of the Hard Rock logo to sponsor the Show and that no Hard Rock venue was available for the shoot.

47.     Other major sponsorships have been lost due to delays in production caused by Fearless's failure to competently perform its duties.

48.     Nor has Fearless obtained the sponsorship of numerous major celebrities, which its director and co-CEO Bridges had assured would be forthcoming.

49.     In particular, Fearless's director and co-CEO Bridges represented that a Hall of Fame New York Yankees pitcher would sponsor and promote the Show.

50.     However, Fearless never secured the Hall of Fame pitcher's sponsorship.

51.     Fearless's director and co-CEO Bridges also repeatedly represented throughout the course of the Show's development and production that an internationally recognized social media influencer would be tweeting in support of the Show.

52.     On information and belief, Bridges repeated these assurances about the social media influencer's purported involvement in promoting the Show to other potential sponsors of the Show who are now no longer interested in sponsorship opportunities, as it has now become clear that the influencer is not and was never involved in sponsoring or promoting the Show.

53.     The JV Agreement also obligates Fearless to "[g]ather all applicants and necessary talent to perform the Show." Ex. A at 5.

54.     Fearless has failed in its duties to gather all contestants necessary to perform the Show, and, indeed, as detailed further below, through the actions of its director and co-CEO Bridges, has attempted to actively undermine Nashville Supergroup's ability to procure and retain the contestants necessary for the Show's production.

## V.     Nashville Supergroup and Bridges Separate, and Bridges Takes Actions to Sabotage the Show and Delay Its Production

55.     During a meeting on October 3, 2022, due to the delinquent behavior and performance of Fearless's director and co-CEO Bridges, Nashville Supergroup's controlling principal Norelli informed Bridges that his involvement in the Show's production as a production manager was no longer needed or desired.

56.     Norelli offered Bridges the opportunity to resign from the Show's production team while retaining full public credit for his participation and receiving his full compensation.

57.     Bridges summarily refused that good-faith proposal, instead responding by lashing out at his business partner Albano—with whom he co-directs and co-manages Fearless—asserting that Albano was "stealing" the Show from him and that Albano was "not [his] partner anymore,"

notwithstanding the fact that Bridges and Albano continue to serve as Fearless's co-directors and co-CEOs.

58.     In the October 3, 2022 meeting, Bridges also asserted that he had access to substantial funds with which he would offer to buy out Nashville Supergroup's investment stake in the Show.

59.     Notably, Nashville Supergroup is aware that, in early September 2022, Defendant Bridges personally received a letter from a third-party investment group unrelated to Nashville Supergroup containing a firm offer to invest $40,000,000 in exchange for 30% of "any and all aspects of [the Show], including the performance show, contracts, royalties, licensing, etc."

60.     Despite this letter, no offer from Bridges has been forthcoming.

61.     Rather than either accept Nashville Supergroup's good-faith separation offer or propose terms for his own purported counteroffer to purchase Nashville Supergroup's ownership interest, Bridges responded by immediately unleashing a disruptive and defamatory attack on the Show designed to cause a halt in production and with the goal of preventing the Show from moving forward entirely.

62.     During the October 3, 2022 meeting with Norelli, Bridges threatened to contact a representative of the Network and "stop" the Show by claiming to the Network that the Show was being "stolen" from him.

63.     Then, on information and belief, Bridges followed through on that threat, informing representatives at the Network in unsolicited communications during the week of October 3, 2022 that the Show had been "stolen" from him. These communications were clearly designed to erode the Network's confidence in the Show's production and interfere with the Show's distribution arrangement with the Network.

64.     At the same time, Bridges, either personally or through his associates and representatives, began reaching out to the 25 contestants who had made it through the Show's initial auditions and who were preparing to be featured in upcoming episodes.

65.     On information and belief, in conversations with the contestants beginning on or around October 3, 2022, Bridges and his representatives began making numerous false and disruptive assertions about the Show.

66.     Among other things, on information and belief, Bridges and his representatives told the contestants that Nashville Supergroup and Bridges's own business partner Albano had "stolen" the Show, a flagrant falsehood given the fact that Bridges's and Albano's company Fearless had freely entered into an arrangement in the JV Agreement and Licensing Agreement in which Nashville Supergroup would fund the Show's production in exchange for Fearless licensing the Show's intellectual property to Nashville Supergroup.  Bridges's claim that the Show has been "stolen" from him is flatly contradicted by the parties' executed and enforceable contracts and is wholly baseless.

67.     Bridges and his representatives made other assertions to the Show's contestants designed to malign the integrity of the Show's leadership and instill a lack of confidence in the quality of its production.

68.     On information and belief, Bridges and his representatives baselessly informed the contestants that the Show is a "scam," that it has been "hijacked," and that the contestants have been "conned."

69.     On October 5, 2022, Nashville Supergroup's counsel prepared and sent Bridges's counsel a letter (the "Cease-and-Desist Letter"), memorializing Bridges's termination from the

Show's production team and demanding that Bridges immediately cease and desist his disruptive and defamatory course of conduct.

70. The Cease-and-Desist Letter noted that Nashville Supergroup has "made every effort to ensure that this separation was done on an amicable basis and that both sides would honor the obligations that they had incurred." The Cease-and-Desist Letter noted that "[a]llegations have reportedly been made to the network and contestants by Mr. Bridges that [Nashville Supergroup] stole the show and are producing an inferior product." And the Cease-and-Desist Letter informed Bridges that "he must cease-and-desist all such conduct and communications which are resulting in significant damage to Nashville Supergroup LLC," and that, should Bridges "fail[] to honor this demand and cease all adverse communications with any related parties, Nashville Supergroup LLC is prepared to bring legal action to protect its interest."

71. Regrettably, Defendant Bridges responded to the Cease-and-Desist Letter by continuing his unlawful behavior in recent days, including by continuing to make false and disruptive statements to the Show's contestants, as well as by blocking promotional material for the Show from view or use by other members of the Show's production team without justification and in a clear attempt to further interfere with the Show's marketing.

72. On information and belief, Bridges has been assisted in his disruptive and defamatory course of conduct by various of his associates and representatives.

73. Further, in his or his representatives' conversations with the Show's contestants, on information and belief, Bridges openly admitted to the contestants that his goal was to "shut the show down" so that he could attempt to gain complete control of its ownership and production. Bridges's motive in engaging in his disruptive and defamatory course of conduct is clear: to unlawfully frustrate and malign the Show's production.

74.     On October 7, 2022, Nashville Supergroup held a Zoom call with the contestants of the Show in an attempt to assuage their fears.  However, Bridges engaged in continued misrepresentations that prevented many of the contestants from moving forward.

## VI.     As a Result of Defendants' Unlawful Actions, Nashville Supergroup Has Suffered Significant and Ongoing Harm

75.     As a result of Defendants Bridges's and Fearless's unlawful behavior, Nashville Supergroup has suffered harm.

76.     Specifically, as of the date of the filing of this Complaint, 13 of the Show's 25 contestants have resigned from the Show's cast after, on information and belief, speaking with Bridges or his representatives in recent days.

77.     The mass resignation of half of the remaining contestants midway through the Show's production has jeopardized and delayed the Show's production schedule and has threatened to derail the Show's production altogether.

78.     Specifically, the resignations of over a dozen contestants have caused Nashville Supergroup to incur costs in contracting with additional companies to source replacement contestants.

79.     Once those contestants are secured, Nashville Supergroup will incur additional costs in negotiating contracts with replacement contestants.

80.     Additionally, the Show's production team will be forced to reshoot parts of several episodes that have already been filmed, at an additional cost, in an attempt to edit out those contestants who have not moved forward with the Show as a result of Bridges's misrepresentations and to include the new contestants that must be sourced.

81.     In addition to costs associated with the contestants, at least one member of the Show's production team—a graphic designer—walked away from the Show on October 8, 2022,

as a result of Defendant Bridges's disruptive and defamatory statements and conduct. The graphic designer has refused to return materials and files owned by Nashville Supergroup, which has further increased costs and delays while the production team recreates materials necessary for production to move forward. Nashville Supergroup was able to secure a replacement graphic designer, but at potentially higher cost than the original designer.

82. Nashville Supergroup has incurred further costs as a result of Defendant Fearless's failure to adequately perform its obligations under the JV Agreement, including the cost of employing a replacement writer for the Show when Fearless failed to provide an adequate script for the Show's episodes.

83. The monetary damage to Nashville Supergroup as a result of Defendants' unlawful behavior has been and continues to be substantial. To date, Nashville Supergroup and its controlling principal have already spent approximately $2.7 million in development and production costs for the Show, with approximately $100,000 being spent on a weekly basis moving forward to cover the Show's payroll costs alone, with additional costs to cover weekly payments to the Show's vendors.

84. In addition, if Defendant Bridges were to succeed in his attempt to sabotage the Show's production, Nashville Supergroup's monetary damages would be colossal.

85. For reference, the investment offer Nashville Supergroup is aware that Defendant Bridges received from a third-party group recently contained a $40,000,000 offer for a 30% stake in the Show. Thus, simple math suggests that, in total, the value of the Show's ownership rights is at least $133,000,000. Indeed, Nashville Supergroup's expectation is that—if it is able to proceed without further hindrance in producing, distributing, and marketing the Show—the Show's ultimate value may greatly exceed that number.

86.     However, the Show's expected value will not be realized if Defendants' disruptive actions are allowed to sideline its production.

87.     And if Defendants are ultimately successful in canceling the Show's current production run, Nashville Supergroup's damages may extend to compensation sought by third parties as well.

88.     For example, Nashville Supergroup has secured sponsors for the Show who have compensated Nashville Supergroup in trade services—*e.g.*, meals for the cast and crew, transportation, and hotel lodging—in exchange for advertisement time when the Show airs.

89.     If the Show is not able to complete production, these third-party sponsorship partners may very well seek recompense from Nashville Supergroup for the trade services they provided as payment for advertising, which may only increase Nashville Supergroup's losses resulting from Defendants' tortious actions.

90.     On information and belief, Defendant Bridges's malicious, disruptive, and defamatory course of conduct is ongoing and continues to hinder and jeopardize Nashville Supergroup's ability to effectively complete the Show's production.

## VII.    Defendant Bridges Has a History of Unlawful Business Dealings, of Which This Is Only the Latest Example

91.     Moreover, this is only the latest in Defendant Bridges's long string of unlawful misbehaviors.  Defendant Bridges has been hailed into court before and had judgments entered against him for past unlawful actions in his business undertakings.

92.     To take one example, in March of 2000, a singer-songwriter who held a trademark for the phrase "Viva NashVegas" sued Bridges and two co-defendants for trademark infringement. *See* Complaint, *George Hamilton, V v. The Stardust Theatre, Inc. et al.*, No. 00-0965-II (Chancery Court for Davidson County, Tennessee, Mar. 28, 2000).

93.    The plaintiff's suit arose because the Stardust Theatre in Nashville—which was under Bridges's management at the time—had been unlawfully producing shows using the "Viva NashVegas" name in violation of the plaintiff's trademark.  *See Hamilton v. Stardust Theatre, Inc.*, No. M2001-00678-COA-R3-CV, 2002 WL 1284280, at *1 (Tenn. Ct. App. June 11, 2002).

94.    According to the plaintiff, before filing suit, he contacted Bridges, who "verbally agreed to license the name from him for $2,400, and to send Mr. Hamilton letters and contracts so the parties could formalize an agreement, but these were never received."  *See Hamilton v. Stardust Theatre, Inc.*, No. M2001-00678-COA-R3-CV, 2002 WL 1284280, at *1 (Tenn. Ct. App. June 11, 2002).

95.    After "realiz[ing] that no licensing agreement would be forthcoming," the plaintiff then "sent a letter to the theater notifying it to cease and desist all use of the trademark.  This did not have the desired effect because advertisements for the production continued to appear in numerous tourist publications.  Mr. Hamilton sent at least four other cease and desist letters," which "apparently had no more effect than the first one."  *See Hamilton v. Stardust Theatre, Inc.*, No. M2001-00678-COA-R3-CV, 2002 WL 1284280, at *1 (Tenn. Ct. App. June 11, 2002).

96.    After the plaintiff filed suit, a default judgment was entered against Bridges and his co-defendants in which it was adjudged that Bridges and his co-defendants had infringed the plaintiff's trademark.  *See Hamilton v. Stardust Theatre, Inc.*, No. M2001-00678-COA-R3-CV, 2002 WL 1284280, at *2 (Tenn. Ct. App. June 11, 2002).

97.    Further, at a subsequent hearing before the trial judge to assess the plaintiff's damages, the theater's manager at the time testified that "Mr. Bridges had shredded or destroyed all the books and records of the enterprise" and "was fired for theft and embezzlement" from his

position as the Stardust Theatre's manager.  *See Hamilton v. Stardust Theatre, Inc.*, No. M2001-00678-COA-R3-CV, 2002 WL 1284280, at *2 (Tenn. Ct. App. June 11, 2002).

98.     In another example, in January of 2017, a vendor that had provided production facilities and services for a previous, failed iteration of the Show sued Bridges's special-purpose corporation Supergroup, Inc., along with one of Bridges's former business partners, asserting that Bridges's company Supergroup, Inc. had failed to pay for over $330,000 in production services. *See* Complaint, *Skyway Studios Enterprises, LLC v. Supergroup, Inc., d/b/a American Supergroup et al.*, No. 17-0027-I (Chancery Court for Davidson County, Tennessee, Jan. 10, 2017).

99.     In yet another example, in August of 2017, Defendant Bridges was sued in Tennessee state court by his former legal counsel in an action seeking payment of over $100,000 in unpaid legal fees.  *See* Complaint, *Neal & Harwell, PLC v. Gary Bridges et al.*, No. 17-0877-II (Chancery Court for Davidson County, Tennessee, Aug. 15, 2017).

100.    That action resulted in a judgment entered by the trial judge in September of 2019 in which liability was adjudged against Defendant Bridges and his co-defendants for the full amount of the fees claimed, plus interest—in total, $157,180.46—in exchange for Bridges and his co-defendants' agreement to pay a partial amount of the fees owed.  *See* Agreed Judgment, *Neal & Harwell, PLC v. Gary Bridges et al.*, No. 17-0877-II (Chancery Court for Davidson County, Tennessee, Sept. 5, 2019).

101.    Thus, as these prior actions make clear, Defendant Bridges entered into his association with Nashville Supergroup after a wave of past legal troubles involving his past business partners and counsel.  Clearly, he has not learned from his prior misdeeds and has continued to engage in unlawful behavior in his business dealings, leading to the instant action in

which Nashville Supergroup seeks relief from his and his company Fearless's damaging and unlawful course of conduct.

## CAUSES OF ACTION

### Count I – Intentional Interference with Business Relationships
**(as to Defendant Gary W. Bridges)**

102.    Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1 to 101 as if fully set forth herein.

103.    In Tennessee, the tort of intentional interference with business relationships has the following five elements: (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and (5) damages resulting from the tortious interference.  *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

104.    Nashville Supergroup has or recently had existing business relationships with specific third parties, including the 13 contestants who recently left the Show's cast.

105.    Bridges has specific knowledge of Nashville Supergroup's existing relationships with these persons as he served as a member of the Show's production team and was actively involved in recruiting many of the contestants.

106.    Bridges made disruptive and defamatory statements to these persons with intent to cause breach or termination of Nashville Supergroup's business relationships with them—a result that has, in some cases, already occurred.  For example, due to Bridges's actions, 13 of the Show's 25 contestants have refused to enter into contractual agreements and move forward with the Show.

107. Bridges made disruptive and defamatory statements to these persons with improper motives, including for the purpose of hindering Nashville Supergroup's ability to complete the Show's production and in an attempt to unlawfully regain control over the Show's ownership and production.

108. Bridges also utilized improper means by making defamatory statements and misrepresentations regarding Nashville Supergroup's right to use the intellectual property for the Show—which was clearly provided for in the JV Agreement—and the potential viability of the Show.

109. Nashville Supergroup has suffered damages as a result of Bridges's intentional interference with its business relationships including, but not limited to, the cost of replacing contestants who have resigned from the Show as a result of Bridges's disruptive and defamatory conduct and other costs to be determined at trial.

110. Further, Bridges acted maliciously, intentionally, fraudulently, or recklessly in intentionally interfering with Nashville Supergroup's business relationships, as a result of which Nashville Supergroup should be awarded both compensatory and punitive damages. *See* Tenn. Code Ann. § 29-39-104(a)(1).

### Count II – Defamation
### (as to Defendant Gary W. Bridges)

111. Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1 to 101 as if fully set forth herein.

112. In Tennessee, defamation has the following three elements: (1) a party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999).

24

"'Publication' is a term of art meaning the communication of defamatory matter to a third person." *Id.* (quotation omitted). Further, "to establish any type of defamation claim, whether slander or libel, the claimant must prove that the defamation resulted in injury to the person's character and reputation." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013).

113. Bridges published several false and defamatory statements to third persons, including his claims to the Show's contestants and to the Network that Nashville Supergroup had "stolen" the Show.

114. These statements were made with knowledge of their false and defamatory nature, with reckless disregard for the truth, or with negligence in failing to ascertain the truth, as Bridges knew that his own company Fearless had engaged in the JV Agreement and Licensing Agreement with Nashville Supergroup in which Fearless licensed the Show's intellectual property to Nashville Supergroup for its use in developing and producing the Show.

115. Nashville Supergroup suffered injury to its character and reputation as a result of Bridges's publication of false and defamatory statements about it including, but not limited to, the loss of business relationships with the 13 contestants who left the Show's cast after Bridges made false and defamatory statements about Nashville Supergroup.

116. Nashville Supergroup has suffered actual damages as a result of Bridges's false and defamatory statements including, but not limited to, the cost of replacing contestants who have resigned from the Show and of reshooting episodes of the Show, along with other production delays, as a result of Bridges's publication of false and defamatory statements.

117. Further, Bridges acted with actual malice in publishing false and defamatory statements about Nashville Supergroup, as a result of which Nashville Supergroup should be awarded both compensatory and punitive damages. *See Myers v. Pickering Firm, Inc.*, 959 S.W.2d

152, 164 (Tenn. Ct. App. 1997) (noting that punitive damages are available for defamatory conduct on a showing of "actual malice").

<b><u>Count III – Breach of Contract</u></b><br>
<b>(as to Defendant Fearless Studios, Inc.)</b>

118.   Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1 to 101 as if fully set forth herein.

119.   In a breach-of-contract action in Tennessee, the plaintiff must prove (1) the existence of a valid and enforceable contract; (2) a deficiency in the performance amounting to a breach; and (3) damages caused by the breach. *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011).

120.   In the JV Agreement, Nashville Supergroup and Fearless entered into a valid and enforceable contract in which Fearless agreed to manage "[a]ll operations and marketing operations and execution thereof" for the Show, including "[a]ll aspects of production" for the Show, "[g]athering all applicants and necessary talent to perform the Show," and "[g]enerating sponsorship, product placement revenue and vendor partners to support the Show."  Ex. A at 5.

121.   Fearless has breached the JV Agreement by failing to perform its responsibilities under the contract in several respects including, but not limited to, its failure to adequately create and provide a script for the Show's episodes, its failure to adequately generate sponsorship for the Show, including the sponsorship of expected primary sponsor Hard Rock Café, and its failure to adequately gather all contestants necessary to perform the Show.

122.   Nashville Supergroup has suffered damages and will continue to suffer damages as a result of Fearless's breach of the JV Agreement through its failure to adequately perform its responsibilities under the contract including, but not limited to, the cost of employing a

replacement writer and graphic designer for the Show, the cost of replacing contestants who have resigned from the Show and of reshooting episodes of the Show, and other production delays.

123.    Moreover, if the Show is not able to complete production, third-party sponsorship partners may very well seek recompense from Nashville Supergroup for the trade services they provided as payment for advertising, which may only increase Nashville Supergroup's losses resulting from Defendant Fearless's actions.

<u>**Count IV – Breach of the Implied Duty of Good Faith and Fair Dealing**</u>
**(as to Defendant Fearless Studios, Inc.)**

124.    Plaintiff repeats and realleges each and every allegation set forth above in paragraphs 1 to 101 as if fully set forth herein.

125.    In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013) (quotation omitted). "For example, every contract includes an implied condition that one party will not prevent performance by the other party." *German v. Ford*, 300 S.W.3d 692, 706 (Tenn. Ct. App. 2009). "The purpose of this implied covenant is (1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered." *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009).

126.    In the JV Agreement, Nashville Supergroup and Fearless entered into a valid and enforceable contract governed by Tennessee law. Ex. A at 21.

127.    In the JV Agreement, among other things, Fearless acknowledged that Nashville Supergroup "is engaged in the business of producing, distributing, marketing and managing" the Show. Ex. A at 1. Fearless further agreed that "[a]ll financial decisions and responsibilities related to the JV Business will be the responsibility of" Nashville Supergroup and that Nashville

Supergroup would be compensated for "all capital loans and expenditures made on behalf or for the benefit of the JV Business" out of the net profits of the Show, as well as an allocation of the Show's net profits above the amount of Nashville Supergroup's investment in the Show. Ex. A at 5–6.

128. Through the disruptive and defamatory conduct of its director and co-CEO Bridges—including, but not limited to, Bridges's false statements to the Show's contestants and to the Network that Nashville Supergroup has "stolen" the Show—Fearless has breached its implied duty of good faith and fair dealing in the JV Agreement.

129. The disruptive and defamatory conduct of Fearless's director and co-CEO Bridges has hindered Nashville Supergroup's ability to perform its own responsibilities under the JV Agreement including, but not limited to, Nashville Supergroup's responsibility to "[n]egotiat[e] all contracts and agreements," namely for contestants of the Show. Ex. A at 5.

130. Further, the disruptive and defamatory conduct of Fearless's director and co-CEO Bridges has also damaged and jeopardized Nashville Supergroup's ability to enjoy the benefits of the JV Agreement including, but not limited to, its reasonable expectation of receiving the return of its investment and proceeds from the profits that result from the Show's distribution pursuant to the terms of the JV Agreement.

131. Nashville Supergroup has suffered damages as a result of Fearless's breach of its implied duty of good faith and fair dealing including, but not limited to, the cost of replacing contestants who have resigned from the Show and of reshooting episodes of the Show, the cost of employing a replacement writer and graphic designer for the Show, and other production delays as a result of Fearless's director and co-CEO Bridges's disruptive and defamatory conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nashville Supergroup seeks the following relief:

a.      An injunction enjoining and restraining Defendants Bridges and Fearless from intentionally interfering with Plaintiff's business relationships or making false statements regarding Plaintiff;

b.      All damages caused by Defendants Bridges's and Fearless's unlawful actions in an amount to be determined at trial, including compensatory and punitive damages;

c.      Granting Plaintiff the costs of this suit including reasonable attorneys' fees, expenses, and court costs; and

d.      Any such other legal, equitable, and further relief as the Court deems just, equitable, and proper.

Dated: October 13, 2022           Respectfully submitted,

                         */s/ Margaret M. Siller*

                         Margaret M. Siller (BPR No. 039058)
                         MAYNARD COOPER & GALE, P.C.
                         1201 Villa Place, Suite 200
                         Nashville, TN 37212
                         Tel: (629) 258.2253
                         Email: MSiller@maynardcooper.com

                         S. Reeves Jordan (*pro hac vice* forthcoming)
                         MAYNARD COOPER & GALE, P.C.
                         1901 6th Avenue North, Suite 1700
                         Birmingham, AL 35203
                         Tel: (205) 415.4907
                         Email: Rejordan@maynardcooper.com

                         *Counsel for Plaintiff Nashville Supergroup, LLC*