# Exhibit A

# JOINT VENTURE FORMATION AGREEMENT

This Joint Venture Formation Agreement (this **"Agreement"**), dated as of ~~August~~ September 11, 2022, is entered into between Nashville Supergroup, LLC, a Tennessee limited liability company (**"JV Party A"**), and Fearless Studios, Inc. a Delaware corporation (**"JV Party B"**; and together with JV Party A, the **"Parties"**).

## RECITALS

WHEREAS, JV Party A is engaged in the business of producing, distributing, marketing and managing a television show known as "Project Supergroup" or any derivate or successor thereof (the **"JV Business"**);

WHEREAS, JV Party B owns and/or has the rights to certain intellectual property rights to be utilized by the Business;

WHEREAS, JV Party A and JV Party B desire to form a Joint Venture, which shall be operated under the JV Party A's limited liability company, Nashville Supergroup, LLC (**"LLC"**) for the purpose of engaging in the JV Business; and

WHEREAS, the Parties desire to enter into this Agreement setting forth the terms and conditions governing their agreement to enter into the transactions contemplated hereby.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.01   Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 1.01:

**"Action"** means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

**"Affiliate"** of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term **"control"** (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise; *provided, however,* that the term "Affiliate" does not, when used with respect to a Party, include the LLC.

**"Agreement"** has the meaning set forth in the preamble.

**"Budget"** means the initial business plan and annual budget for LLC, in the form attached as **Exhibit A**.

**"Business Day"** means any day except Saturday, Sunday, or any other day on which commercial banks located in State of Tennessee are authorized or required by Law to be closed for business.

**"Certificate of Formation"** has the meaning set forth in Section 2.01(a).

**"Change of Control"** means, with respect to a Party: (a) the disposition, by sale, assignment, conveyance, transfer, lease, exchange, or otherwise, of a majority of the assets of such Party to one or more Independent Third Parties, whether in one transaction or a series of related transactions; (b) a sale resulting in more than fifty (50%) of the shares of stock, limited liability company interests, partnership interests, or other ownership or equity interests of such Party being held, directly or indirectly, by one or more Independent Third Parties; or (c) a merger, consolidation, recapitalization, or reorganization of such Party with or into an Independent Third Party that results in the inability of the owners of such Party immediately prior to such transaction to designate or elect a majority of the board of directors, managers, or other governing authority of the resulting entity or its parent company.

**"Closing"** has the meaning set forth in Section 3.01.

**"Closing Date"** has the meaning set forth in Section 3.01.

**"Code"** shall mean the Internal Revenue Code of 1986, as amended, in effect as of the date hereof and as amended from time to time hereafter.

**"Encumbrance"** means any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance.

**"Governmental Authority"** means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction.

**"Governmental Order"** means any order, writ, judgment, injunction, decree, stipulation, determination, penalty, or award entered by or with any Governmental Authority.

**"Independent Third Party"** means, with respect to a Party, any Person who is not an Affiliate of such Party.

**"Intellectual Property"** has the meaning set forth in Section 4.04(c).

**"JV Business"** has the meaning set forth in the Recitals.

**"JV Party A"** has the meaning set forth in the preamble.

2

**"JV Party A Ancillary Agreements"** means such other agreements, instruments, and documents required to be delivered by JV Party A in connection with this Agreement or at the Closing.

**"JV Party A Initial Contribution"** means the Initial Capital Contribution of JV Party A which shall consist of an immediate contribution of $10,000 U.S. Dollars and a loan of $3,000,000.00 U.S. Dollars, payable as needed by the JV Business.

**"JV Party A MAE"** means a material adverse effect on JV Party A's ability to consummate the transactions contemplated by and carry out its obligations under this Agreement, the LLC Agreement, or any JV Party A Ancillary Agreements on a timely basis.

**"JV Party B"** has the meaning set forth in the preamble.

**"JV Party B Ancillary Agreements"** means such other agreements, instruments, and documents required to be delivered by JV Party B in connection with this Agreement or at the Closing.

**"JV Party B IP"** has the meaning set forth in the JV Party B License Agreement.

**"JV Party B License Agreement"** means the License Agreement between JV Party B and LLC in the form attached as **Exhibit B** hereto.

**"JV Party B MAE"** means a material adverse effect on JV Party B's ability to consummate the transactions contemplated by and carry out its obligations under this Agreement, the LLC Agreement, or any JV Party B Ancillary Agreements on a timely basis.

**"JV Party B Services Agreement"** means a Services Agreement between JV Party B and LLC.

**"Law"** means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, judgment, decree, other requirement, or rule of law of any Governmental Authority.

**"LLC"** has the meaning set forth in the Recitals.

**"Material Adverse Effect"** means a material adverse change in the regulatory or market conditions applicable to the JV Business, which would be reasonably likely to have a material adverse effect on the JV Business, taken as a whole; *provided, however*, that, none of the following, in combination or alone, shall constitute or be taken into account in determining whether there has been or will be a Material Adverse Effect: (i) general economic or political conditions; (ii) any changes in financial or securities markets in general; (iii) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; or (iv) the public announcement, pendency, or completion of the transactions contemplated by this Agreement ; or *provided, further, however*, that the exceptions in clauses [(i) through (iv) shall not apply to the extent that the effects or changes set forth in such clauses have a disproportionate effect on the JV Business, taken as a whole, relative to the other participants in the industry in which the JV Business will operate.

"**Net Profits**" and "**Net Losses**" shall mean, for each fiscal year during the term of this Agreement (or other period for which they are determined), the income and gain, and the losses and deductions of LLC, respectively, in the aggregate or separately stated, as appropriate, determined by LLC's independent accountant.

"**Parties**" has the meaning set forth in the preamble.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means an individual, corporation, partnership, joint venture, Limited Liability Company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Representatives**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person or its Affiliates.

"**Restricted Period**" has the meaning set forth in Section 6.05(a).

"**Transaction Agreements**" means, collectively, this Agreement, any JV Party A Ancillary Agreements, and any JV Party B Ancillary Agreements.

**Section 1.02    Interpretation.** For purposes of this Agreement: (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, or modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II
## ESTABLISHMENT OF JOINT VENTURE

**Section 2.01    JV Entity Formation.**

(a)    Subject to the terms and conditions of this Agreement, on or prior to the Closing Date, JV Party A shall form LLC by filing a Certificate of Formation (the

4

"**Certificate of Formation**") with the Office of the Secretary of State of Tennessee.

(b)     Before the Closing, LLC shall not engage in the conduct of any trade or business nor have any assets or liabilities.

## Section 2.02   Responsibilities.

(a)     <u>JV Party A</u>. All financial decisions and responsibilities related to the JV Business will be the responsibility of JV Party A, including the following:

(i)      Finalization of all budgets related to the JV Business;

(ii)     Handling of all revenues and expenses;

(iii)    Distribution of all funds to 1099 contractors;

(iv)    Maintaining and sharing all financial data relevant to the JV Business;

(v)     Securing additional capital funding, as needed; and

(vi)    Negotiating all contracts and agreements with respect to the foregoing.

(b)     <u>Operations and Marketing</u>. All operations and marketing operations and execution thereof shall be the responsibility of JV Party B, including the following:

(i)      All aspects of production for top quality entertainment TV/streaming show (collectively, the "**Show**");

(ii)     Gathering all applicants and necessary talent to perform the Show;

(iii)    Generating sponsorship, product placement revenue and vendor partners to support the Show;

(iv)    Performing all aspects of producing the Show within budget and in a commercially reasonable timeframe;

(v)     Maintaining a commercially reasonable regiment of forwarding revenue and expense paperwork to LLC; and

(vi)    Securing any possible additional capital.

Notwithstanding the foregoing, JV Party B shall consult with JV Party A on all Operations and Marketing decisions, and JV Party A shall have final decision-making authority.

## Section 2.03   Allocations of Net Profits and Net Losses.

5

(a)    Except as otherwise required by the Code or as provided in this Agreement, the Net Profits and Net Losses for each fiscal year during the term of this Agreement shall be determined in accordance with the accounting methods followed by LLC for federal income tax purposes and shall be allocated among the Parties as follows:

(i)    First, to JV Party A, in the amount of any and all capital loans and expenditures made on behalf or for benefit of the JV Business; then,

(ii)    during the first year under this Agreement, Net Profits shall be allocated as follows: 20% to JV Party A and 80% to JV Party B,

(iii)    during the second year under this Agreement, Net Profits shall be allocated as follows: 15% to JV Party A and 85% to JV Party B, and

(iv)    during the third year under this Agreement, Net Profits shall be allocated as follows: 10% to JV Party A and 90% to JV Party B.

(b)    If any additional capital is raised or contributed by a third party for the benefit of the joint venture, and such third party is entitled to the receipt of a portion of the Net Profits, any amounts due to JV Party A under this Section 2.03 shall be reduced to accommodate such distribution of Net Profits to such third party.

**Section 2.04    Operations after Term**

(a)    On or prior to the three (3) year anniversary of this Agreement, the Parties shall establish a limited liability company to further the joint venture and execute an operating agreement or similar agreement to govern it.

(i)    The new entity agreement shall provide for the following:

(A)    A Board of Managers (Nico and Joe) will govern the operations of the new entity.

(B)    Generally, decisions will be by majority board rule, except certain decisions will require unanimous consent, including decisions related to expenditures in excess of a certain amount and budget.

(b)    Profit and Loss distributions will be as agreed between the parties, pro rata. Exhibit C.

(A)    Rights of First Refusal if a party wishes to sell.

(B)    Additional loans/contributions, if any, will be funded by the LLC based on parameters to be determined.

6

## ARTICLE III
## CLOSING

**Section 3.01 Closing.** Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated by this Agreement (the **"Closing"**) shall take place at the offices of Maynard Cooper & Gale, P.C. 's Nashville, TN office, or remotely by exchange of documents and signatures (or their electronic counterparts), on the date hereof. The date on which the Closing is to occur is herein referred to as the **"Closing Date"**.

**Section 3.02 Closing Deliveries.** At the Closing:

    (a)    JV Party A shall deliver to JV Party B or LLC, as applicable, the following:

        (i)    confirmation that the JV Party A Initial Contribution to LLC by wire transfer of immediately available funds to an account established for LLC; and

        (ii)    an executed counterpart signature page of JV Party A to the JV Agreement and any JV Party A Ancillary Agreements.

    (b)    JV Party B shall deliver to JV Party A or LLC, as applicable, the following:

        (i)    the JV Party B Initial Contribution to LLC in the form of an unlimited license to the Intellectual Property of Supergroup, as set forth in **Exhibit B's Schedule 1**;the JV Party B License Agreement; and

        (ii)    an executed counterpart signature page of JV Party B to the JV Agreement and any JV Party B Ancillary Agreements.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF JV PARTY A

JV Party A represents and warrants to JV Party B that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01 Organization and Qualification of JV Party A.** JV Party A is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Tennessee and has full company power and authority to own, operate, or lease the assets now owned, operated, or leased by it, and to carry on its business as currently conducted. JV Party A is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the conduct of its business as currently conducted makes such licensing or qualification necessary.

**Section 4.02 Authority of JV Party A; Enforceability.** JV Party A has full company power and authority to enter into this Agreement, and any JV Party A Ancillary Agreements, to carry out its obligations hereunder and thereunder, and to consummate the transactions

7

contemplated hereby and thereby. The execution, delivery, and performance by JV Party A of this Agreement, the LLC Agreement, and any JV Party A Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite entity action on the part of JV Party A and, if required, its Affiliates. This Agreement has been duly executed and delivered by JV Party A, and (assuming due authorization, execution, and delivery by the other Party) constitutes a legal, valid, and binding obligation of JV Party A, enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity. When the LLC Agreement and each JV Party A Ancillary Agreement has been duly executed and delivered by JV Party A (assuming due authorization, execution, and delivery by each other party thereto), each such agreement will constitute a legal, valid, and binding obligation of JV Party A, enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 4.03   No Conflicts; Consents.** The execution, delivery, and performance by JV Party A of this Agreement, the LLC Agreement, and any JV Party A Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with the articles of organization, or other organizational documents of JV Party A or its Affiliates; (b) violate or conflict with any Governmental Order or Law applicable to JV Party A or any of its Affiliates; or (c) except as set forth on Section 4.03 of the Disclosure Schedules or as would not, individually or in the aggregate, have a JV Party A MAE, conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration, or modification of any obligation or loss of any benefit under any contract or other instrument to which JV Party A or its Affiliates is a party or otherwise bound. Except as set forth on Section 4.03 of the Disclosure Schedules, noNo consent, approval, waiver, or authorization is required to be obtained by JV Party A or its Affiliates from any Person in connection with the execution, delivery, and performance by JV Party A of this Agreement,  any JV Party A Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, except such consents, approvals, waivers, or authorizations which would not, individually or in the aggregate, have a JV Party A MAE.

**Section 4.04   Intellectual Property.**

(a)      JV Party A owns or has adequate, valid, and enforceable rights to use all the JV Party A IP, free and clear of all Encumbrances, and has the power and authority to either license or sublicense the JV Party A IP to LLC. Neither JV Party A nor its Affiliates is bound by any outstanding judgment, injunction, order, or decree restricting the use of the JV Party A IP, or restricting the licensing thereof to any Person.

(b)      The prior and current use of the JV Party A IP by JV Party A and its Affiliates has not and does not infringe, violate, dilute, or misappropriate the Intellectual Property of any Person and there are no claims pending or threatened by any Person with respect to the ownership, validity, enforceability, effectiveness, or use of the JV Party A IP. To JV Party A's knowledge, no Person is infringing, misappropriating, diluting, or

8

otherwise violating any of the JV Party A IP, and neither JV Party A nor any of its Affiliates has made or asserted any claim, demand, or notice against any Person alleging any such infringement, misappropriation, dilution, or other violation.

(c) **"Intellectual Property"** means any and all of the following in any jurisdiction throughout the world: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) websites and internet domain name registrations; and (vi) other intellectual property and related proprietary rights, interests, and protections (including all rights to sue and recover and retain damages, costs, and attorneys' fees for past, present, and future infringement and any other rights relating to any of the foregoing).

**Section 4.05    Legal Proceedings.** There is no Action of any nature pending or, to JV Party A's knowledge, threatened against or by JV Party A or any of its Affiliates that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, the LLC Agreement, or any JV Party A Ancillary Agreements. To JV Party A's knowledge, no event has occurred, or circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such Action.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF JV PARTY B**

JV Party B represents and warrants to JV Party A that the statements contained in this ARTICLE V are true and correct as of the date hereof.

**Section 5.01    Organization and Qualification of JV Party B.** JV Party B is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of New York and has full company power and authority to own, operate, or lease the assets now owned, operated, or leased by it, and to carry on its business as currently conducted. JV Party B is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the conduct of its business as currently conducted makes such licensing or qualification necessary.

**Section 5.02    Authority of JV Party B; Enforceability.** JV Party B has full company power and authority to enter into this Agreement, the LLC Agreement, and any JV Party B Ancillary Agreements, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution, delivery, and performance by JV Party B of this Agreement, the LLC Agreement, and any JV Party B Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite entity action on the part of JV Party B and, if required, its Affiliates. This Agreement has been duly executed and delivered by JV Party B, and (assuming due authorization, execution, and delivery by the other Party) constitutes a legal, valid, and binding obligation of JV Party B, enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar Laws affecting the enforcement of creditors' rights generally or by general

9

principles of equity. When the LLC Agreement and each JV Party B Ancillary Agreement has been duly executed and delivered by JV Party B (assuming due authorization, execution, and delivery by each other party thereto), each such agreement will constitute a legal, valid, and binding obligation of JV Party B, enforceable against it in accordance with its terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar Laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 5.03    No Conflicts; Consents.** The execution, delivery, and performance by JV Party B of this Agreement, the LLC Agreement, and any JV Party B Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate or conflict with the certificate of organization, operating agreement, or other organizational documents of JV Party B or its Affiliates; (b) violate or conflict with any Governmental Order or Law applicable to JV Party B or any of its Affiliates; or (c) except as set forth on Section 5.03 of the Disclosure Schedules or as would not, individually or in the aggregate, have a JV Party B MAE, conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration, or modification of any obligation or loss of any benefit under any contract or other instrument to which JV Party B or its Affiliates is a party or otherwise bound. Except as set forth on Section 5.03 of the Disclosure Schedules, no consent, approval, waiver, or authorization is required to be obtained by JV Party B or its Affiliates from any Person in connection with the execution, delivery, and performance by JV Party B of this Agreement, any JV Party B Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby[, except such consents, approvals, waivers, or authorizations which would not, individually or in the aggregate, have a JV Party B MAE.

**Section 5.04    Intellectual Property.**

(a)    JV Party B owns or has adequate, valid, and enforceable rights to use all the JV Party B IP, free and clear of all Encumbrances, and has the power and authority to either license or sublicense the JV Party B IP to LLC. Neither JV Party B nor its Affiliates is bound by any outstanding judgment, injunction, order, or decree restricting the use of the JV Party B IP or restricting the licensing thereof to any Person.

(b)    The prior and current use of the JV Party B IP by JV Party B and its Affiliates has not and does not infringe, violate, dilute, or misappropriate the Intellectual Property of any Person and there are no claims pending or threatened by any Person with respect to the ownership, validity, enforceability, effectiveness, or use of the JV Party B IP. To JV Party B's knowledge, no Person is infringing, misappropriating, diluting, or otherwise violating any of the JV Party B IP, and neither JV Party B nor any of its Affiliates has made or asserted any claim, demand, or notice against any Person alleging any such infringement, misappropriation, dilution, or other violation.

**Section 5.05    Legal Proceedings.** There is no Action of any nature pending or, to JV Party B's knowledge, threatened against or by JV Party B or any of its Affiliates that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, the LLC Agreement, or any JV Party B Ancillary Agreements. To JV Party B's knowledge, no

10

event has occurred, or circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such Action.

**ARTICLE VI**
**COVENANTS**

**Section 6.01    Access to Information.** From the date hereof until the Closing, each Party shall (a) afford to the other Party and its Representatives full and free access to and the right to inspect all of the properties, assets, premises, books and records, contracts, and other documents and data of such Party or its Affiliates that are reasonably related to the JV Business or the Budget; (b) furnish the other Party and its Representatives with such financial, operating, and other data and information in the possession of such Party or its Affiliates reasonably related to the JV Business or the Budget as the other Party or any of its Representatives may reasonably request; and (c) instruct its Representatives to cooperate with the other Party in its investigation of the JV Business and the Budget. Without limiting the foregoing, each Party shall permit the other Party and its Representatives to inspect such information as a reasonable time, place and location. Any investigation pursuant to this Section 6.01 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the other Party or its Affiliates. No investigation by any Party or other information received by such Party shall operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by the other Party in this Agreement.

**Section 6.02    Notice of Certain Events.**

(a)     From the date hereof until the Closing, each Party shall promptly notify the other Party in writing of:

(i)     any fact, circumstance, event, or action the existence, occurrence, or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by such Party hereunder not being true and correct, or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions to such Party's obligations to consummate the transactions contemplated by this Agreement, in each case as set forth in Section 6.10, to be satisfied;

(ii)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by the Transaction Agreements;

(iii)     any notice or other communication from any Governmental Authority in connection with the transactions contemplated by the Transaction Agreements; and

(iv)     any Actions commenced or, to such Party's knowledge, threatened against, relating to, or involving such Party or its Affiliates that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant

11

to Section 4.05 (in the case of JV Party A), Section 5.05 (in the case of JV Party B), or that relates to the consummation of the transactions contemplated by the Transaction Agreements.

(b)     A Party's receipt of information pursuant to this Section 6.02 shall not operate as a waiver or otherwise affect any representation, warranty, or agreement given or made to such Party in this Agreement (including for purposes of Section 8.02(a)) and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 6.03    Governmental Approvals and Consents.**

(a)     Each Party shall, as promptly as possible, (i) make, or cause or be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders, and approvals from all Governmental Authorities that in either case may be or become necessary for its execution and delivery of, and the performance of its obligations pursuant to, the Transaction Agreements. Each Party shall and shall cause its Affiliates to cooperate fully with the other Party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders, and approvals. The Parties shall not and shall not cause or permit their Affiliates to willfully take any action that will have the effect of delaying, impairing, or impeding the receipt of any required consents, authorizations, orders, and approvals.

(b)     Each Party shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in Section 4.03 and Section 5.03 of the Disclosure Schedules necessary for the consummation of the transactions contemplated under the Transaction Agreements.

(c)     Without limiting the generality of the Parties' undertakings pursuant to subsections (a) and (b) above, each Party shall and shall cause its Affiliates to use all reasonable best efforts to:

(i)     respond to any inquiries by any Governmental Authority regarding matters with respect to the transactions contemplated by any Transaction Agreement;

(ii)     avoid the imposition of any order or the taking of any action that would restrain, alter, or enjoin the transactions contemplated by any Transaction Agreement; and

(iii)     in the event any Governmental Order adversely affecting the ability of the Parties to consummate the transactions contemplated by any Transaction Agreement has been issued, to have such Governmental Order vacated or made inapplicable to the transactions contemplated by any such Transaction Agreement.

(d)     All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either Party

12

or its Affiliate before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between either Party or its Affiliate with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law, or any disclosure containing Confidential Information shall be disclosed to the other Party in advance of any filing, submission, or attendance, it being the intent that the Parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each Party shall give notice to the other Party with respect to any meeting, discussion, appearance, or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other Party with the opportunity to attend and participate in such meeting, discussion, appearance, or contact.

(e)     Notwithstanding the foregoing, nothing in this Section 6.03 shall require, or be construed to require, a Party or its Affiliate to agree to (i) sell, hold, divest, discontinue, or limit, before or after the Closing Date, any assets, businesses, or interests of such Party or any of its Affiliates; (ii) any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses, or interests which, in either case, could reasonably be expected to materially and adversely impact the economic or business benefits to such Party or its Affiliates of the transactions contemplated by the Transaction Agreements; or (iii) any material modification or waiver of the terms and conditions of the Transaction Agreements.

**Section 6.04   Exclusivity.** From the date hereof until the earlier of the Closing Date and the termination of this Agreement, except as provided in this Agreement, neither Party shall, nor shall it cause or permit any of its controlled Affiliates or Representatives to, without the prior written consent of the other Party, enter into or otherwise participate in any discussions or negotiations with any Person (other than the other Party, its Affiliates, or their Representatives) with respect to any potential transaction involving the JV Business, the Budget, or the nature or subject matter thereof.

**Section 6.05   Non-Solicitation.**

(a)     From the date hereof until the earlier of the Closing Date and one (1) year after the termination of this Agreement (the "**Restricted Period**"), neither Party shall, and shall not cause or permit any of its Affiliates to, directly or indirectly, hire or solicit any person who is or was employed by the other Party during the Restricted Period, encourage any such employee to leave such employment, or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; *provided, that* nothing in this Section 6.05(a) shall prevent a Party or its Affiliate from hiring (i) any employee whose employment has been terminated by the other Party or (ii) after one hundred eighty (180) days from the date of termination of employment, any employee whose employment has been terminated by the employee.

13

(b)     Each Party acknowledges that the restrictions contained in Section 6.05(a) are reasonable and necessary to protect the legitimate interests of the other Party and constitute a material inducement to the other Party to enter into this Agreement and consummate the transactions contemplated hereby. In the event that any covenant contained in Section 6.05(a) should ever be adjudicated to exceed the time, geographic, product, service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, or other limitations permitted by applicable Law. The covenants contained in Section 6.05(a) and each provision thereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 6.06   Acknowledgement.** Each Party acknowledges that its breach or threatened breach of Section 6.04 or Section 6.05(a) would give rise to irreparable harm to the other Party, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such Party of any of such obligations, the other Party shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 6.07   Confidentiality.** Each Party acknowledges and agrees that the Confidentiality Agreement [1]remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to it in connection with the transactions contemplated by this Agreement and the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby, including pursuant to Section 6.01. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with its terms..

**Section 6.08   Public Announcements.** No Party shall cause the publication of any press release or public announcement regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed), except as may be required by applicable Law, in which case the Party required to publish such press release or public announcement shall, to the extent practicable, allow the other Party a reasonable opportunity to comment on such press release or public announcement in advance of such publication.

**Section 6.09   Survival.** Subject to the limitations and other provisions of this Agreement: (a) the representations and warranties of the Parties contained herein shall survive

---

[1] Note to draft: Please provide a copy of the Confidentiality Agreement.

any investigation made by a Party and the Closing; and (b) the covenants and other agreements of the Parties contained herein shall survive the Closing.

Section 6.10 **Further Assurances.** Following the Closing, each Party shall, and shall cause its Affiliates to, use its reasonable best efforts to execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Agreements.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.01 **Conditions to Obligations of Both Parties.** The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a) No Governmental Authority shall have enacted, issued, promulgated, enforced, or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement or the Transaction Agreements illegal, otherwise restraining or prohibiting consummation of such transactions, or causing any of the transactions contemplated hereunder or thereunder to be rescinded following completion thereof.

(b) JV Party A shall have received all consents, authorizations, orders, and approvals from the Governmental Authorities referred to in Section 4.03 of the Disclosure Schedules and JV Party B shall have received all consents, authorizations, orders, and approvals from the Governmental Authorities referred to in Section 5.03 of the Disclosure Schedules, in each case, in form and substance reasonably satisfactory to JV Party A and JV Party B, and no such consent, authorization, order, and approval shall have been revoked, and all waiting periods, if any, shall have expired.

(c) All approvals, consents, and waivers from third parties that are required to consummate the transactions consummated by the Transaction Agreements shall have been received.

(d) No Action shall have been commenced against a Party, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated by the Transaction Agreements.

(e) The Certificate of Formation shall have been filed with the Secretary of State of Delaware.

(f) LLC shall have received all Permits that are necessary for it to conduct the JV Business in accordance with the Budget as of the Closing Date.

15

(g)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect.

**Section 7.02    Conditions to Obligations of JV Party A.** The obligations of JV Party A to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or JV Party A's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of JV Party B contained in Section 5.01 and Section 5.02, the representations and warranties of JV Party B contained in this Agreement and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects in the case of any representation or warranty qualified by materiality or a JV Party B MAE or in all material respects (in the case of any representation or warranty not qualified by materiality or a JV Party B MAE)commence on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of JV Party B contained in Section 5.01 and Section 5.02 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     JV Party B shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date; *provided, that*, with respect to agreements, covenants, and conditions that are qualified by materiality, JV Party B shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(c)     JV Party A shall have completed its due diligence review of JV Party B to its reasonable satisfaction.

(d)     JV Party B shall have delivered to JV Party A duly executed counterpart signature pages of JV Party B, any JV Party B Ancillary Agreements, and such other documents and deliveries set forth in Section 3.02(b).

(e)     JV Party A shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of JV Party B, that each of the conditions set forth in Section 7.02(a) and Section 7.02(b) have been satisfied (the "**JV Party B Closing Certificate**").

(f)     JV Party A shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of JV Party B certifying (i) that attached thereto are true and complete copies of all resolutions adopted by the Director(s) of JV Party B authorizing the execution, delivery, and performance of this Agreement, any JV Party B Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby

16

and (ii) the names and signatures of the officers of JV Party B authorized to sign this Agreement, any JV Party B Ancillary Agreements, and the other documents to be delivered by JV Party B hereunder and thereunder.

**Section 7.03  Conditions to Obligations of JV Party B.** The obligations of JV Party B to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or JV Party B's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of JV Party A contained in Section 4.01 and Section 4.02, the representations and warranties of JV Party A contained in this Agreement, and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects in the case of any representation or warranty qualified by materiality [or a JV Party A MAE) or in all material respects (in the case of any representation or warranty not qualified by materiality or a JV Party A MAE) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of JV Party A contained in Section 4.01 and Section 4.02 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)     JV Party A shall have duly performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date; *provided, that*, with respect to agreements, covenants, and conditions that are qualified by materiality, JV Party A shall have performed such agreements, covenants, and conditions, as so qualified, in all respects.

(c)     JV Party B shall have completed its due diligence review of JV Party A to its reasonable satisfaction.

(d)     JV Party A shall have delivered to JV Party B duly executed counterpart signature pages of JV Party A to any JV Party A Ancillary Agreements and such other documents and deliveries set forth in Section 3.02(a).

(e)     JV Party B shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of JV Party A, that each of the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied (the "**JV Party A Closing Certificate**").

(f)     JV Party B shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of JV Party A certifying (i) that attached thereto are true and complete copies of all resolutions adopted by the Manager(s) of JV Party A authorizing the execution, delivery, and performance of this Agreement, any JV Party A Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the

17

resolutions adopted in connection with the transactions contemplated hereby and thereby and (ii) the names and signatures of the officers of JV Party A authorized to sign this Agreement, any JV Party A Ancillary Agreements and the other documents to be delivered by JV Party A hereunder and thereunder.

## ARTICLE VIII
## TERMINATION

**Section 8.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

**Section 8.02**    will continue until the earlier of (i) the mutual written consent of the Parties hereto, (ii) the consummation of a Sale Transaction, or (iii) three (3) years from the date hereof.

(a)    by either Party by written notice to the other Party if such terminating Party is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in, or failure to perform any representation, warranty, covenant, or agreement made by the other Party pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Section 6.10 and such breach, inaccuracy, or failure has not been cured by the other Party within ten (10) days of the other Party's receipt of written notice of such breach from such terminating Party;

(b)    by either Party by written notice to the other Party in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement or any other Transaction Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or any other Transaction Agreement and such Governmental Order shall have become final and non-appealable; *provided, however,* that the provisions of this Section 8.01(c)(ii) shall not be available to a Party unless such Party shall have used its reasonable best efforts to oppose any such Governmental Order or to have such Governmental Order vacated or made inapplicable to the transactions contemplated by this Agreement or such other Transaction Agreement;

(c)    by either Party by written notice to the other Party if such terminating Party is not then in material breach of any provision of this Agreement and the other Party experiences a Change of Control; or

(d)    by either Party by written notice to the other Party if the Closing has not occurred on or prior to August 31, 2022; *provided, however,* that no Party shall have the right to terminate the Agreement under this Section 8.02(d) if such Party shall have failed to comply with any of the covenants, agreements, or conditions hereof to be performed or complied with by it prior to the Closing and such failure shall been the cause of, or shall have resulted in, the failure of the Closing to occur prior to such date.

18

**Section 8.03   Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any Party except:

       (a)     as set forth in this Section 8.03, Section 6.05, Section 6.06, Section 6.07, Section 6.08, and ARTICLE IX hereof; and

       (b)     that nothing herein shall relieve any Party from liability for any liability resulting from any willful breach of this Agreement prior to such termination.

**ARTICLE IX**
**MISCELLANEOUS**

**Section 9.01   Expenses.** Except as otherwise provided in this Agreement, all costs and expenses incurred in connection with the preparation and execution of this Agreement and the other Transaction Agreements, and the transactions contemplated hereby and thereby, shall be paid by the Party incurring such costs and expenses.

**Section 9.02   Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or email of a .pdf document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Party at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 9.02):

If to JV Party A:           Nashville Supergroup, LLC

                            2280 n. Ronald Reagan Blvd.,

                            Longwood, FL 32750

                            Facsimile:    None

                            Email: JNorelli@35techgroup.com

                            Attention:    Joseph Norelli

with a copy to:         Maynard Cooper & Gale, P.C.

                            200 E. New England Avenue, Suite 300

                            Winter Park, FL 32789

                            Facsimile:    407.647.2157

                            Email: thadley@maynardcooper.com

                            Attention:    Ralph V. Hadley, III

19

| | |
|---|---|
| If to JV Party B: | Fearless Studios, Inc. |
| | 79 Madison Avenue |
| | 15th Fl. |
| | New York, NY 10016 |
| | Email: nicoalbano007@gmail.com |
| | Attention:    Nico Albano |
| with a copy to: | Abrams Fensterman, LLP |
| | 3 Dakota Drive Suite 300 |
| | Lake Success, New York 11042 |
| | Email: GStoller@Abramslaw.com |
| | Attention:    Greg H. Stoller, Esq. |

**Section 9.03   Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.04   Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 9.05   Entire Agreement.** This Agreement, the agreements contemplated hereby, and the Confidentiality Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter, including.

**Section 9.06   Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder may not be assigned by a Party without the written consent of the other Party.

**Section 9.07   No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever.

**Section 9.08   Amendment and Modification.** This Agreement, including any Disclosure Schedule or Exhibit, may only be amended, modified, or supplemented by an agreement in writing signed by each Party.

**Section 9.09   Waiver.** No waiver by a Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by a Party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 9.10   Governing Law.** This Agreement (and any claims, causes of action, or disputes that may be based upon, arise out of, or relate to the transactions contemplated hereby, to the negotiation, execution, or performance hereof, or to the inducement of any Party to enter herein, whether for breach of contract, tortious conduct, or otherwise and whether predicated on common law, statute, or otherwise) shall in all respects be governed by and construed in accordance with the internal laws of the State of Tennessee without giving effect to any choice or conflict of law provision or rule (whether of the State of Tennessee or any other jurisdiction).

**Section 9.11   Submission to Jurisdiction.** Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby shall be instituted in the federal courts of the United States of America or the courts of the State of Tennessee, in each case located in the city of Nashville and Davidson County, or the federal courts of the United States of America or the courts of the State of Tennessee, in each case located in Davidson County, Tennessee and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.

**Section 9.12   Relationship of Parties.** The relationship of the Parties established by this Agreement is that of independent contractors, and nothing herein shall be construed to constitute the Parties as partners, joint venturers, co-owners, or otherwise as participants in a joint or common undertaking, except as specifically set forth in this Agreement. Neither Party has any authority to either obligate the other or any of its Affiliates in any respect or hold itself out as having any such authority unless specifically agreed upon by the Parties in advance and in writing.

**Section 9.13   Attorneys' Fees.** In the event that a Party institutes any legal suit, action, or proceeding, including arbitration, against the other Party in respect of a matter arising out of or relating to this Agreement, the prevailing Party in the suit, action, or proceeding shall be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such Party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs

**Section 9.14   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

[JV PARTY A]

Nashville Supergroup, LLC,

a Tennessee limited liability company

By _____

Name: Joseph Norelli

Title: Manager

[JV PARTY B]

Fearless Studios, Inc.,

a New York corporation

By _____

Name:

Title: Director

# Intellectual Property License Agreement

This Intellectual Property License Agreement ("**Agreement**"), dated as of August ___, 2022, and effective as of the same date, (the "**Effective Date**"), is by and between Fearless Studios, Inc. a Delaware corporation ("**Licensor**") and Nashville Supergroup, LLC, a Tennessee limited liability company ("**Licensee**") (collectively, the "**Parties**," or each, individually, a "**Party**").

WHEREAS, Licensor and Licensee are partners of a Joint Venture Agreement, dated August _, 2022, (the "**JV Agreement**") for the purpose of producing, distributing, marketing and managing a television show known as "Project Supergroup" or any derivate or successor thereof (the "**Business**");

WHEREAS, Licensor owns or has the right to utilize certain trademarks, trade secrets know-how, proprietary information, and other intellectual property, including those items set forth on Schedule 1, as may be supplemented or amended from time to time (collectively, the "**Licensed Intellectual Property**"); and

WHEREAS, Licensee wishes to use the Licensed Intellectual Property, and Licensor is willing to grant to Licensee a license to use the Licensed Intellectual Property, to facilitate Licensee's conduct of the Business.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. <u>License</u>.

   1.1   <u>License Grant</u>. Subject to the terms and conditions of this Agreement and the JV Agreement, Licensor hereby grants to Licensee during the Term (as defined below) an exclusive, royalty-free, non-transferable (except as provided in Section 11), non-sublicensable (except as provided in Section 1.2) license to use the Licensed Intellectual Property in connection with the conduct of the Business, including to:

   (a)   make, use, offer to sell, sell, import, advertise, market, and distribute products and provide the services and any other products or services that the Parties may agree upon in writing from time to time (collectively, the "**Licensed Products**"); and,

   (b)   use the marks listed on Schedule 1 as part of Licensee's corporate name, company name, or trade name, as applicable; and;

   (c)   reproduce, publicly perform, transmit, publicly display, and distribute, and create derivative works based on the works listed on Schedule 1 through all media now known or hereafter developed.

   1.2   <u>Sublicensing</u>. Licensee may not grant sublicenses under this Agreement, except that Licensee may grant a sublicense of any of its rights under this Agreement to one

or more of its Affiliates, provided that (a) Licensee shall ensure that each sublicensee complies with the applicable terms and conditions of this Agreement; (b) any act or omission of a sublicensee that would be a material breach of this Agreement if performed by Licensee will be deemed to be a material breach by Licensee; and (c) each sublicense will terminate automatically effective as of the earlier of (i) termination of this Agreement under Section 10 and (ii) the date the sublicensee ceases to be an Affiliate of Licensee. An "**Affiliate**" of an entity means any other entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such entity, and "control" (including as used in the terms "controlled by" and "under common control with") means the ownership, beneficially or of record, of more than fifty one percent (51%) of the voting securities of an entity.

     1.3    Reservation of Rights. Licensor hereby reserves all rights not expressly granted to Licensee under this Agreement.

2.    Use of Licensed Intellectual Property.

     2.1    Notices. Licensee shall ensure that all use of Licensed Intellectual Property hereunder is accompanied by or marked with the appropriate proprietary rights notices, symbols, and legends as may be reasonably necessary under applicable law to maintain the Licensed Intellectual Property and Licensor's proprietary rights therein and in such order and manner as may be reasonably specified by Licensor.

     2.2    Modifications. As between the Parties, Licensor owns any improvement, enhancement, or other modification of or derivative work based on any of the Licensed Intellectual Property made by or on behalf of Licensee or Licensor (each, a "**Modification**"). Licensee shall immediately notify Licensor of any Modification made by or on behalf of Licensee (each, a "**Licensee Modification**"). Licensee hereby assigns to Licensor all of its right, title, and interest in and to all Licensee Modifications, including all rights to apply for any patents or other intellectual property registrations with respect to such Licensee Modifications and all enforcement rights and remedies for past, present, and future infringement thereof and all rights to collect royalties and damages therefor. All patent applications and applications for registration filed by Licensor with respect to any such Licensee Modification and all patents or registrations issuing therefrom shall automatically be included in the Licensed Intellectual Property and subject to the license granted to Licensee under Section 1.1. At the request of Licensor, Licensee shall promptly execute and deliver such documents as may be necessary or desirable to effect and perfect the foregoing assignment of rights.

     2.3    Quality.

        (a)    Quality Standards and Use Guidelines. Licensee acknowledges and is familiar with the high standards and reputation for quality symbolized by the marks included in the Licensed Intellectual Property as of the Effective Date ("**Licensed Marks**"), and Licensee shall conduct the Business and use the Licensed Marks in a manner at least consistent with such quality standards and reputation. Licensee shall

26

comply with Licensor's guidelines and specifications regarding the style, appearance, and usage of the Licensed Marks.

(b) <u>Quality Control</u>. Licensor may exercise quality control over all uses of the Licensed Marks under this Agreement to maintain the validity of the Licensed Marks and protect the goodwill associated therewith. For the purpose of monitoring Licensee's compliance with Licensor's quality standards and the other requirements set forth in this Section 2.3, at Licensor's reasonable request and at Licensor's expense, (i) Licensor (or its representative) may inspect Licensee's and its sublicensees' facilities, on reasonable notice and during normal business hours; and (ii) Licensee shall submit to Licensor a representative sample of any use of the Licensed Marks by Licensee or its sublicensees for Licensor's review and approval, subject to Section 2.3(c). Licensee acknowledges and agrees that, based on the special relationship of trust between the Parties, Licensor may reasonably rely on Licensee to perform any inspection or review necessary to ensure Licensee's and its sublicensees' compliance with Licensor's quality standards and the other requirements set forth in this Section 2.3.

(c) <u>Approvals</u>. Licensor acknowledges and agrees that all uses of the Licensed Marks made by Licensee and its sublicensees as of the Effective Date meet Licensor's quality standards and the other requirements set forth in this Section 2.3 and are hereby deemed approved by Licensor. Approval of any use by Licensee or any sublicensee of the Licensed Marks, once given by Licensor, will continue in effect, without need for future approval, so long as Licensee's or the applicable sublicensee's use of the Licensed Marks in connection with the Licensed Products/goods and services of the Business continues to be substantially consistent with such previously approved use.

3. <u>Ownership and Protection of the Licensed Intellectual Property</u>.

(a) <u>Acknowledgment of Ownership</u>. Licensee acknowledges that Licensor owns and will retain all right, title, and interest in and to the Licensed Intellectual Property subject to the license granted in Section 1.1.

(b) <u>Prosecution and Maintenance</u>. Licensor has the sole right, in its discretion and at its expense, to file, prosecute, and maintain all applications, registrations, and patents relating to the Licensed Intellectual Property. Licensee shall provide, at the request of Licensor and at Licensor's expense, all necessary assistance with such filing, maintenance, and prosecution.

4. <u>Enforcement</u>.

**4.1** Each Party shall promptly notify the other Party in writing of any actual, suspected, or threatened infringement, misappropriation, or other violation of any Licensed Intellectual Property by any third party of which it becomes aware. Licensor has the first right, in its discretion, to (a) bring any action or proceeding with respect to any such infringement; (b) defend any declaratory judgment action concerning any Licensed Intellectual Property; and (c) control the conduct of any such action or proceeding (including

27

any settlement thereof); provided that, if Licensor does not commence an action or proceeding within ninety (90) days after receipt of a written request from Licensee to assume control over enforcement of any Licensed Intellectual Property with respect to such infringement, Licensee may, in its discretion, to bring such action or proceeding and control the conduct thereof. Licensor shall join any such action or proceeding brought by Licensee if necessary for Licensee to have standing.

4.2     The Party that does not control any action or proceeding brought under Section 4.1 (the "**Non-Enforcing Party**") shall provide the other Party (the "**Enforcing Party**") with all assistance that the Enforcing Party may reasonably request, at the Non-Enforcing Party's expense, in connection with any such action or proceeding. The Enforcing Party will be entitled to apply any monetary recovery resulting from any such action or proceeding (including any settlement thereof) for its own account in satisfaction of any of its unreimbursed expenses and legal fees, and shall pay fifty percent (50%) of any remaining amount to the Non-Enforcing Party.

**4.3**     If Licensor has notified Licensee of its intention not to bring suit against or otherwise prosecute any alleged infringer or has failed to bring such suit or prosecute such alleged infringer, then Licensee shall have the right, but shall not be obligated, to prosecute any infringement of the Licensed Intellectual Property at the expense of Licensor, and Licensee hereby agrees that Licensor may join Licensee as a party plaintiff in any such suit or, if necessary, Licensee may prosecute such suit solely in the name of Licensor. Licensee shall control any such proceeding and Licensor shall cooperate with Licensee. No settlement, consent judgment or other voluntary final disposition of the suit may be entered into without the consent of Licensor if the terms of such settlement materially adversely affect Licensor's rights with respect to the Licensed Intellectual Property.

5.     <u>Recordation of License</u>. Upon Licensee's request, Licensor shall make all necessary filings to record this Agreement in the United States Patent and Trademark Office, the United States Copyright Office, and in the corresponding offices or agencies in any and all countries where it may be required under applicable law, including as a prerequisite to enforcement of the Licensed Intellectual Property or enforceability of this Agreement in the courts of such countries, and any recordation fees and related costs and expenses will be at Licensor's expense.

6.     <u>Payment</u>. As consideration in full for the rights granted herein, Licensee and Licensor have entered into the JV Agreement, of which execution of this Agreement is a term and condition thereof.

7.     <u>Confidentiality</u>. Each Party acknowledges that in connection with this Agreement it will gain access to certain confidential and proprietary information of the other Party (collectively, "**Confidential Information**"). Without limiting the foregoing, for purposes of this Agreement, all trade secrets and confidential information included in the Licensed Intellectual Property, including unpublished patent applications and invention disclosures, will be deemed Confidential Information of Licensor. Each Party shall maintain the Confidential Information in strict confidence and not disclose any Confidential Information to any other person, except to its employees who (a) have a need to know such Confidential Information for such Party to exercise its rights or perform its obligations hereunder; and (b) are bound by written nondisclosure

agreements. Each Party shall use reasonable care, at least as protective as the efforts it uses with respect to its own confidential information, to safeguard the Confidential Information from use or disclosure other than as permitted hereby.

8. <u>Indemnification</u>. Licensee shall indemnify, defend, and hold harmless Licensor, its Affiliates, officers, directors, employees, agents and representatives against all losses, liabilities, claims, damages, actions, fines, penalties, expenses or costs (including court costs and reasonable attorneys' fees) arising out of or in connection with any third-party claim, suit, action, or proceeding relating to (a) any breach of this Agreement by Licensee; (b) use by Licensee or any sublicensee of any Licensed Intellectual Property under this Agreement; except for any claim based solely on infringement, misappropriation, or other violation of any intellectual property rights or other personal or proprietary rights of any person or entity arising out of Licensee's permitted use of any Licensed Intellectual Property in accordance with this Agreement. An "**Affiliate**" of an entity means any other entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such entity, and "control" (including as used in the terms "controlled by" and "under common control with") means the ownership, beneficially or of record, of more than fifty one percent (51%) of the voting securities of an entity.

9. <u>Disclaimer; Limitation of Liability</u>.

9.1 <u>Disclaimer</u>. EACH PARTY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, IN CONNECTION WITH THIS AGREEMENT AND THE LICENSED INTELLECTUAL PROPERTY, INCLUDING ANY WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, (A) LICENSOR MAKES NO REPRESENTATION OR WARRANTY CONCERNING THE VALIDITY, ENFORCEABILITY, OR SCOPE OF THE LICENSED INTELLECTUAL PROPERTY; AND (B) LICENSOR SHALL HAVE NO LIABILITY WHATSOEVER TO LICENSEE OR ANY OTHER PERSON FOR OR ON ACCOUNT OF ANY INJURY, LOSS, OR DAMAGE ARISING OUT OF OR IN CONNECTION WITH [THE MANUFACTURE, USE, OFFER FOR SALE, SALE, OR IMPORT OF ANY LICENSED PRODUCT OR OTHERWISE IN CONNECTION WITH] THE USE OF ANY LICENSED INTELLECTUAL PROPERTY.

9.2 <u>Limitation of Liability</u>. EXCEPT FOR LICENSEE'S LIABILITY FOR INDEMNIFICATION UNDER SECTION 8, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES RELATING TO THIS AGREEMENT OR USE OF THE LICENSED INTELLECTUAL PROPERTY HEREUNDER, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10. <u>Term and Termination</u>.

29

10.1    Term. This Agreement begins on the Effective Date and will remain in force until the expiration or termination of the JV Agreement ("**Term**").

11.    Assignment. Licensee may not assign or transfer any of its rights or obligations under this Agreement other than to one of its Affiliates without Licensor's prior written consent. Any purported assignment or transfer in violation of this Section 11 will be void and of no force and effect.

12.    General Provisions.

12.1    Amendments. No amendment to this Agreement will be effective unless it is in writing and signed by both Parties.

12.2    No Third-Party Beneficiaries. Except for the right of Licensor's Affiliates, officers, directors, employees, agents, and representatives to enforce their rights to indemnification under Section 8, this Agreement solely benefits the Parties and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

12.3    Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

12.4    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

12.5    Governing Law. This Agreement, including all exhibits, schedules, attachments, and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Tennessee, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Tennessee.

12.6    Waiver. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

12.7    Notices. All correspondence or notices required or permitted to be given under this Agreement must be in writing, in English and addressed to the other Party at its address set out below (or to any other address that the receiving Party may designate from time to time). Each Party shall deliver all notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage

30

prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) upon receipt by the receiving Party; and (b) if the Party giving the notice has complied with the requirements of this Section. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as specified in a notice given in accordance with this Section 12.7):

| | |
|---|---|
| If to JV Party A: | Nashville Supergroup, LLC |
| | 2280 N. Ronald Reagan Blvd., |
| | Longwood, FL 32750 |
| | Facsimile: None |
| | Email: JNorelli@35techgroup.com |
| | Attention: Joseph Norelli |
| with a copy to: | Maynard Cooper & Gale, P.C. |
| | 200 E. New England Avenue, Suite 300 |
| | Winter Park, FL 32789 |
| | Facsimile: 407.647.2157 |
| | Email: thadley@maynardcooper.com |
| | Attention: Ralph V. Hadley, III |
| If to JV Party B: | Fearless Studios, Inc. |
| | 79 Madison Avenue |
| | 15th Fl. |
| | New York, NY 10016 |
| | Email: nicoalbano007@gmail.com |
| | Attention: Nico Albano |
| with a copy to: | Abrams Fensterman, LLP |
| | 3 Dakota Drive Suite 300 |
| | Lake Success, New York 11042 |
| | Email: GStoller@Abramslaw.com |
| | Attention: Greg H. Stoller, Esq. |

12.8 <u>Entire Agreement</u>. This Agreement, including and together with any related exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of Licensor and Licensee with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter.

31

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

**LICENSEE**

Nashville Supergroup, LLC,

a Tennessee limited liability company

By _____

Name: Joseph Norelli

Title: Manager

**LICENSOR**

Fearless Studios, Inc.,

a New York corporation

By _____

Name:

Title: Director

## SCHEDULE 1

### Licensed Intellectual Property

a.     USPTO Registration No. 4705484: American SuperGroup

b.     USPTO Registration No. 97056035: Project Supergroup

## SCHEDULE 1

### Licensed Intellectual Property

a. USPTO Registration No. 4705484: "American SuperGroup"

b. USPTO Registration No. 97056035: "Project Supergroup"

35